[988 NYS2d 852]

In the Matter of HUGH L. CAREY, Governor of the State of New York, et al., for a Judicial Determination as to the Publication of Volumes 2 and 3 of the Final Report of BERNARD S. MEYER, Special Deputy Attorney General, Evaluating the Conduct of the Investigation by the Special Prosecutor into the RETAKING OF ATTICA CORRECTIONAL FACILITY ON SEPTEMBER 13, 1971, and Related Events Subsequent Thereto.

Supreme Court, Wyoming County, April 24, 2014

## APPEARANCES OF COUNSEL

*Martin J. Mack* and *Michael J. Russo* for petitioner.

*Richard E. Mulvaney* and *Stephen G. DeNigris* for Police Benevolent Association of the New York State Troopers, Inc., proposed intervenor.

*Michael P. Ravalli* for New York State Police Investigators Association, proposed intervenor.

*Edward C. Cosgrove* for Lavonne Williams, proposed intervenor.

## OPINION OF THE COURT

PATRICK H. NeMOYER, J.

The Court's Role in this Matter

In this matter, which is initiated by New York State Attorney General Eric T. Schneiderman, this court sits as the successor to the criminal court that supervised the Wyoming County grand jury[1] that, between 1971 and 1975, heard testimony and considered other evidence presented by then New York State Attorney General Louis J. Lefkowitz[2] (in the person or under the supervision of then Special Deputy Attorney General Robert E. Fisher and his successor, then Special Deputy Attorney General Anthony Simonetti) in relation to any crimes that may have been committed during the September 9-13, 1971 prison uprising at Attica Correctional Facility, and/or as part or in the aftermath of the September 13, 1971 forcible retaking of that facility by prison authorities and the State Police. This court further sits as the successor to those courts that, as overseers of the grand jury, adjudicated two prior (ultimately unsuccessful) applications by the Attorney General for permission to disclose to the public, subject to whatever redactions of grand jury materials might be ordered by those courts, volumes 2 and 3 of the October 1975 report of then Special Assistant Attorney General Bernard S. Meyer (which document is entitled "Final Report of the Special Attica Investigation" and is referred to herein as the Meyer Report or the report).

1. Actually, there were two grand juries impaneled in the matter, the first in November 1971 and the second in May 1974.

2. Pursuant to Executive Law § 63 (2), the Governor had required the Attorney General to act as the prosecutor in the matter, in the place of the Wyoming County District Attorney.

The Meyer Report

The three-volume Meyer Report, which has been submitted to this court in proposed redacted form for this court's in camera review, was solicited by and delivered to then Governor Hugh L. Carey and then Attorney General Lefkowitz within a several-month period in 1975.[3] The purpose of the Meyer investigation and report was to make findings concerning the propriety of the then several-years-old but still ongoing criminal investigation by the Attorney General into the prison uprising and retaking and its aftermath. The Meyer investigation and report were prompted by the resignation of former Special Assistant Attorney General Malcolm H. Bell, a member of the Attica prosecutorial staff, who had alleged in his letter of resignation to the Attorney General (complaints later amplified in Bell's 160-page report to the Governor) that Simonetti's handling of the prosecution "lack[ed] integrity." Thus, the essence of the Meyer investigation and report was to address whether there had been an official cover-up of crimes related to the retaking of Attica, or whether the relative paucity of indictments against police and correction officers involved in the prison retaking and its aftermath (in comparison to the numerous indictments of inmates involved in the rebellion) was the result of legal and evidentiary obstacles not borne of corruption. The upshot of the report was Meyer's conclusion that there had been "no intentional cover[-]up in the conduct of the Attica investigation" and grand jury presentment. Meyer more particularly concluded that the investigation and possible prosecution of law enforcement personnel for alleged acts of homicide, assault, or at least reckless endangerment committed during the prison retaking or the "rehousing" of inmates—or for alleged perjury and other hindrances to prosecution at subsequent junctures—had not been intentionally obstructed. Meyer concluded, however, that the investigation and grand jury presentment had been seriously compromised from September 13, 1971 by "extraordinarily deficient" police work, especially with regard to the preservation of ballistics and other physical evidence; that the ensuing investigation was underbudgeted at its outset; that the initial effort to prosecute crimes should have been more evenhanded in its focus and in its treatment of inmates vis-à-vis law enforcement personnel; and that the attempted

---

**3.** The Governor had directed the Attorney General to look into the Attica investigation and prosecution pursuant to Executive Law § 63 (8); the Attorney General had deputized Meyer for that purpose.

prosecution of law enforcement personnel could have been more competently handled by the prosecutors, who made some serious misjudgments in administration but were not corrupt in their motivations. Meyer also made recommendations as to the appropriate future course and conduct of the investigation and grand jury presentment.

The 130-page volume 1 of the Meyer Report, which was disclosed to the public by the Governor and Attorney General in December 1975, set forth the 12 basic findings and the five recommendations of Meyer, together with some factual analysis supporting the first few (relatively innocuous) findings. Inasmuch as it contained no explicit references to grand jury evidence, volume 1 was disclosed without redaction (even as to any names of individuals mentioned therein, which were generally limited to those of elected state and local officials, high gubernatorial appointees, members of the Attorney General's investigative and prosecutorial staff, and higher-ups in the State Police and Department of Corrections). In contrast, volumes 2 and 3 of the Meyer Report, which have never been disclosed to the public (and which form the entire subject of this proceeding), set forth the much more specific factual bases for Meyer's (more sensitive) findings about the lack of any corruption in the Attorney General's investigation and grand jury presentment.

The basic reason why volumes 2 and 3 remain undisclosed to the public since 1975 is that they contain extensive passages culled by Meyer from the presumptively secret record of proceedings before the Attica grand jury (*see* CPL 190.25 [4]) for the purpose of buttressing his reported findings. Those passages include many direct quotations from and lengthy discussions of testimony and other evidence placed before the grand jury, references that of course include the names of select grand jury witnesses or targets. Moreover, throughout volumes 2 and 3 are sprinkled (i.e., including in contexts distinct from the aforementioned grand jury references) the names of various inmates, police, correction and other public officials, and private citizens, as well as other information tending to identify those persons. Many of those persons are named or otherwise identified or described in the report as having been involved in the events of September 1971 (i.e., the uprising, the retaking, and the alleged acts of official retaliation against inmates), and many were witnesses before, and/or indicted or never-indicted targets of, the grand jury.

Within several months after the completion of the Meyer Report, the Attorney General's criminal investigation was

concluded, the Attica grand jury was discharged, and all indictments then pending against 24 inmates and one state trooper were dismissed. Within a year of that, the Governor pardoned seven convicted inmates and commuted the sentence of an eighth, and he announced that no disciplinary action would be taken against 20 police officers and prison officials, all as part of the Governor's intent to "close the book" on the events at Attica. As of that time, however, much civil litigation remained ongoing.

The Prior Court Orders and the Instant Requests to Modify Them

Now before this court is an application by the current Attorney General (or petitioner) for leave to renew (see CPLR 2221 [a], [e]) two applications made by his predecessors, the first before Wyoming County Supreme Court Justice Carmen F. Ball (*Matter of Carey*, 92 Misc 2d 316 [1977], *affd* 68 AD2d 220 [4th Dept 1979, Simons, J.; Doerr, J., dissenting]), and the second before Wyoming County Supreme Court Justice Frederick H. Marshall (*Matter of Carey*, Nov. 20, 1980, index No. 15062 [not officially reported]). The first request for renewal concerns Attorney General Lefkowitz's August 5, 1977 application for a judicial determination of which portions of volumes 2 and 3 of the Meyer Report, possibly including their references to presumptively secret grand jury evidence, might be released to the public. That application culminated in a November 29, 1977 decision and a December 22, 1977 order of Justice Ball (92 Misc 2d 316, 330), who directed the Attorney General to "redact and exclude any and all reference to Grand Jury testimony from the Meyer report, volumes 2 and 3," as mandated by CPL 190.25 (4). That aspect of the order was upheld by the Fourth Department in May 1979 (68 AD2d 220).

It is to be noted here that, in connection with his 1977 application, the Attorney General (at least eventually) proposed to redact the names of at least some individuals mentioned in volumes 2 and 3 (i.e., even other than in reference to grand jury evidence), as necessary to prevent any reputational injury to such individuals,[4] a proposed set of redactions that the Fourth Department ultimately indicated (on two occasions) was not

---

4. The Appellate Division characterized that proposal as one by the Governor (the Attorney General's co-appellant) to redact from volumes 2 and 3 the "names of Grand Jury witnesses and unindicted targets of the [Grand Jury] investigation" (*Matter of Carey* [unpublished mem/order dated July 6, 1979]).

mandated by law, and thus not for the courts to determine, but rather completely discretionary with the Attorney General and/or Governor (*see Matter of Carey [Fischer]*, 68 AD2d at 224; *see also Matter of Carey* [unpublished memorandum/order of Appellate Division, Fourth Department, dated July 6, 1979]). It is further to be noted that, in ruling on the 1977 application, Justice Ball clearly contemplated the eventual release of volumes 2 and 3 of the Meyer Report, but only following the court-ordered excision of any and all references therein to grand jury evidence, and additionally only following the implementation of a procedure whereby individuals who had come in for criticism in the Meyer Report, presumably including grand jury witnesses or targets, could review for themselves the judicially redacted version of volumes 2 and 3[5] (*Matter of Carey*, 92 Misc 2d at 328-330; *see* order of Sup Ct, Wyoming County, Ball, J., dated Dec. 22, 1977).

It further must be noted here that Justice Ball's denial of permission to disclose grand jury evidence was frontally challenged on appeal by the Governor and Attorney General, who argued, insofar as relevant herein, that publication of the full Meyer Report, including its references to grand jury evidence, was essential on account of "the strong public interest involved in knowing the extent to which the criminal justice, press and police systems were or were not lacking in integrity" during the Attica investigation, and who further contended that volumes 2 and 3 would be meaningless to the public unless the grand jury references were included in the released version (*Matter of Carey [Fischer]*, 68 AD2d at 229). The Fourth Department rejected those arguments, determining that Justice Ball had not abused his discretion in denying the state officials permission to publish the grand jury evidence referenced within volumes 2 and 3 of the Meyer Report (*see Matter of Carey [Fischer]*, 68 AD2d at 227-230). In now seeking renewal of the 1977 application, the Attorney General asks that this court modify the (affirmed) December 22, 1977 order of Justice Ball in order to permit the release of volumes 2 and 3 *without* the court-ordered (and upheld on appeal) redactions of grand jury evidence from those

---

5. Likening the Meyer Report to a grand jury report concerning public corruption (which the Meyer Report clearly is not [*Matter of Carey*, 92 Misc 2d at 328]), Justice Ball evidently desired to give affected or criticized persons time to appeal his order or file a rebuttal to the report, all as contemplated by CPL 190.85 (3) in the case of the issuance of a judicially "accepted" grand jury report concerning public corruption (*see generally Matter of Carey [Fischer]*, 68 AD2d at 234 [Doerr, J., dissenting]).

volumes, but with the redaction of names and other identifying information set forth in those volumes,[6] i.e., names of grand jury witnesses and targets[7] mentioned within and without the passages setting forth the grand jury evidence.[8]

---

**6.** The 573-page, three-volume Meyer Report contains, besides its title page and tables of contents, 481 pages of text (130 pages in volume 1, 185 pages in volume 2, and 166 pages in volume 3), plus two separately paginated appendices, a 90-page list of exhibits considered as part of the Meyer investigation, and a two-page alphabetical witness list of those who testified as part of the Meyer investigation. Volume 3 historically included the aforementioned appendices. The Attorney General proposes to publicly release the 90-page list of exhibits, albeit in a form redacted of most names (but not grand jury references per se). However, the Attorney General evidently does not propose to release the two-page alphabetical witness list, which consists of almost nothing but names.

**7.** According to his papers,

"[p]etitioner proposes to redact *all* names of persons who appeared before the Attica Grand Juries or were referred to in Grand Jury testimony *other than*: (1) elected officials such as the Governor and Attorney General and high-ranking appointed officials, such as the Commissioner of DOCS and the Superintendent of the State Police; (2) persons who were injured or killed during the rebellion or retaking; (3) persons who served as judges, prosecutors [or] investigators during the Attica criminal prosecution; and (4) law enforcement, medical and other personnel who played a secondary or inconsequential role in the criminal matters that were the subject of the Attica investigation and prosecutions." (*See* n 11, *infra*.)

**8.** The Attorney General's notice of motion explicitly seeks the following relief:

"(1) an order pursuant to CPLR 2221 (a) and (e) granting leave to renew Petitioner's August 5, 1977, application to this Court seeking judicial guidance and direction as to which portions of [the Meyer Report] should be released to the public, and also Petitioner's August 1, 1980, application to this Court seeking both *in camera* review of Petitioner's proposed redactions to Volumes 2 and 3 of the Meyer Report and the modification of this Court's Order of December 22, 1977, directing the redaction from such Volumes of any and all references to Grand Jury testimony; and,

"(2) upon the granting of such motion for leave to renew, an order modifying the December 22, 1977, Order and this Court's subsequent Order of January 16, 1981, which permanently sealed Volumes 2 and 3, to require the redaction by Petitioner from such Volumes of only the names of Grand Jury witnesses and certain persons referenced therein as well as other specific identifying information; and,

"(3) after reviewing Petitioner's proposed redactions *in camera* and thereafter providing an opportunity to the affected parties and their attorneys to review and be heard thereon, an order

The second application that petitioner seeks to renew is the August 1, 1980 application by then Attorney General Robert Abrams, which application culminated in a November 20, 1980 decision and a January 26, 1981 order of Supreme Court Justice Marshall. By that application, the Attorney General asked that the court undertake an in camera review of the Attorney General's proffered redactions to volumes 2 and 3 (i.e., the redactions of grand jury evidence called for by Justice Ball's order and the Appellate Division's affirmance thereof) and thereafter permit publication of volumes 2 and 3 in that proposed redacted form. It appears that, despite the prior representations to the Appellate Division, the Attorney General at that stage was no longer proposing (and not yet re-proposing) to generally redact from the volumes in question the names or identities of grand jury witnesses and targets (i.e., as mentioned in portions of the Meyer Report not directly referencing grand jury evidence). It is to be noted, however, that in formally seeking the release of volumes 2 and 3 in court-ordered redacted form, the former Attorney General saw fit to complain that releasing the volumes after stripping them of all references to grand jury evidence would present to the public "a largely gutted, distorted and meaningless document." For example, the Attorney General noted that 64 of 96 pages in one section of volume 2, and 68 of 102 pages in a particular section of volume 3, would, in keeping with Justice Ball's affirmed directives, be "completely or substantially stricken" from the public's version of the Meyer Report.

In denying the 1980 application, Justice Marshall indicated his agreement (in a manner of speaking) with the Attorney General's complaints that the proposed redactions would so "emasculate[ ]" the volumes in question as to render them "incomprehensible" to the public. Indeed, Justice Marshall set forth his view that releasing the volumes in (previously court-ordered) redacted form would exacerbate the risk that the public would misunderstand the actual occurrences at issue without alleviating the risk that unindicted individuals would be exposed to unfounded accusations and hence reputational injury. Consequently, after concluding that the purposes of the Meyer investigation had been fulfilled with the release of volume 1, and after further concluding that publication of volumes 2 and 3 (even in a form redacted of grand jury material) would not

---

unsealing Volumes 2 and 3 and releasing them in such redacted form to the public."

serve the public interest, Justice Marshall ordered that volumes 2 and 3 of the Meyer Report be "permanently sealed." The Attorney General did not appeal from that order.[9]

Now, in seeking renewal of the 1980 application, the incumbent Attorney General asks that this court modify the 1981 order of Justice Marshall so as to permit publication of volumes 2 and 3 without the initially court-ordered redactions of grand jury evidence (see supra), but subject to or following the Attorney General's voluntary[10] redaction of certain names and certain personally identifying information sprinkled throughout those volumes.[11] Finally, in seeking renewal of both prior applications, the Attorney General asks that this court, after reviewing the proposed redactions in camera, give affected parties and their attorneys an opportunity to "review and be heard" on the sufficiency of such redactions, and that the court thereafter unseal volumes 2 and 3 and release them in appropriately redacted form to the public.[12]

Responses to the Application

In response to petitioner's application, the court has received some formal and some informal submissions. The formal submissions take the form of cross motions to intervene in the proceeding either as of right pursuant to CPLR 1012 or by

9. In his papers, petitioner describes the evident initial expectation of all concerned that volumes 2 and 3 would eventually be publicly released in some form as having been "inexplicably . . . unmet" for decades. In the view of this court, the failure of former Attorney General Abrams to appeal Justice Marshall's 1981 order goes a long way towards explaining that situation.

10. Actually, what petitioner now formally requests is an order by which this court might "require" (see n 8, supra) such redaction of such names. However, this court cannot read the Fourth Department's two pronouncements on this subject other than as indicating that the redaction of such names (apart from those mentioned in explicit connection with grand jury evidence) is not legally required but rests in the discretion of the Attorney General (see Matter of Carey [Fischer], 68 AD2d at 224; see also Matter of Carey, July 6, 1979 unpublished mem/order of Appellate Division, Fourth Department).

11. In his papers, petitioner proposes the "narrow[ ]" redaction from volumes 2 and 3 of only the "names of Grand Jury witnesses and of certain persons referenced therein" (see n 7, supra), as well as "other specific identifying information." The Attorney General thus would redact the names of those inmates, police and correction officials, and others who were grand jury witnesses and/or targets or potential targets, and certain potentially identifying information about such individuals, including their rank or other official status, their place of employment or residence, their specific injuries, and even the type of firearm and ammunition that they may have owned or used at the time of the prison retaking.

12. See n 8, supra.

permission pursuant to CPLR 1013. Those cross motions are made by, respectively, two police unions and one individual. The police unions are the New York State Police Investigators Association and the Police Benevolent Association of the New York State Troopers, Inc. Those unions premise their requests to intervene on the fact that their respective members include some now-retired state police officers who participated in the retaking of the prison, who may have testified before the Attica grand jury, who may have been targeted by that grand jury but who were never indicted, and/or whose conduct may have come in for criticism in the Meyer Report. The individual proposed intervenor is Lavonne Williams, the widow of Captain Henry F. Williams of the New York State Police, who assertedly was in the chain of command concerning the retaking of the prison and who later testified before the Attica grand jury. All three cross movants would intervene for the purpose of opposing, on both procedural and substantive grounds, the Attorney General's application to renew the prior applications and modify the prior orders of Justices Ball and Marshall. The Attorney General does not oppose intervention pursuant to CPLR 1013 (relief thus granted without further discussion) but rather replies to the intervenors' substantive arguments in opposition to the application.

Also to be considered in connection with the instant application are about a dozen communications addressed to this court by citizens or public officials interested in the issues raised by the application. Of those communications (mostly letters), almost all advocate for the release of the remaining volumes of the Meyer Report (a couple take no explicit position on that issue). One of the communications takes the form of an affidavit by former Special Assistant Attorney General Malcolm Bell, whose resignation as Attica special prosecutor gave rise to the Meyer investigation and report. Bell advocates for the full release of the Meyer Report.

Upon its consideration of the papers before it, this court renders the following determinations on the following discrete issues:

Whether the Court Should Grant Renewal

The first issue for the court's resolution is whether petitioner has articulated a basis for renewal of his 1977 and 1980 applications. CPLR 2221 provides, in pertinent part:

"(e) A motion for leave to renew:

"1. shall be identified specifically as such;

"2. shall be based upon new facts not offered on the prior motion that would change the prior determination or shall demonstrate that there has been a change in the law that would change the prior determination; and

"3. shall contain reasonable justification for the failure to present such facts on the prior motion.

"(f) . . . If a motion for leave to . . . renew is granted, the court may adhere to the determination on the original motion or may alter that determination."

A motion for leave to renew is generally intended to bring to the court's attention new or additional facts which, because genuinely new, or although in existence at the time the original motion was made, were unknown to the movant and therefore not earlier brought to the court's attention (*see Tishman Constr. Corp. of N.Y. v City of New York*, 280 AD2d 374, 376 [1st Dept 2001], citing *William P. Pahl Equip. Corp. v Kassis*, 182 AD2d 22 [1st Dept 1992], *lv dismissed in part, denied in part* 80 NY2d 1005 [1992], and *Foley v Roche*, 68 AD2d 558 [1st Dept 1979]; *see generally Chiappone v William Penn Life Ins. Co. of N.Y.*, 96 AD3d 1627 [4th Dept 2012]). However, the court may also grant renewal, in the interest of justice, based upon facts that were known to the movant at the time the original motion was made (*see Tishman Constr. Corp. of N.Y.*, 280 AD2d at 376, citing *Liberty Mut. Ins. Co. v Allstate Ins. Co.*, 237 AD2d 260, 262 [2d Dept 1997], and *Vayser v Waldbaum, Inc.*, 225 AD2d 760, 760 [2d Dept 1996]). In either case, "[r]enewal should be denied where the party fails to offer a valid excuse for not submitting the additional facts upon the original application" (*Foley*, 68 AD2d at 568; *see* CPLR 2221 [e] [3]; *Kirby v Suburban Elec. Engrs. Contrs., Inc.*, 83 AD3d 1380, 1381 [4th Dept 2011], *lv dismissed* 17 NY3d 783 [2011]). A motion for leave to renew is addressed to the sound discretion of the court (*see Matheus v Weiss*, 20 AD3d 454, 454-455 [2d Dept 2005]; *see also Kirby*, 83 AD3d at 1381).

In support of renewal (and release of virtually all of the Meyer Report, including its grand jury references), petitioner posits the existence of new facts, including (1) the passage of more than three decades since the prior court orders, during which time the privacy-related concerns of identified grand jury witnesses and other persons referenced in the Meyer Report have diminished (and can now be addressed with narrowly tailored redactions of only names); (2) the continuing and profound

historical significance of the previously sealed volumes of the Meyer Report "in light of the enduring legacy of the Attica uprising" itself; and (3) the fact that all Attica-related civil and criminal litigation was concluded long ago. Although not formally premising the renewal motion on a change in the law, the Attorney General also suggests that the law governing the public disclosure of grand jury evidence has evolved since the prior determinations in this matter, and that some courts have permitted such disclosure for reasons of historical significance. In opposition, the intervenors argue that there are no new facts warranting renewal of the prior applications.

■ The court agrees with much of the intervenors' stance. The mere passage of time cannot be a new fact warranting renewal, lest any order be subject on that basis alone to reopening at any time (and indeed become more and more susceptible to reopening as time goes on). Moreover, this court must take issue with the Attorney General's contention that the enduring historical significance of the events at Attica could not have been noted or foreseen in 1981.[13] Nonetheless, the court feels that petitioner has sufficiently articulated changed circumstances since the 1977 and 1981 orders, including the fact that all criminal and civil litigation arising out of the Attica uprising and retaking and its aftermath has been concluded. Moreover, with particular reference to the societal interests that compelled Justice Ball and the Appellate Division to deny release of the grand jury evidence decades ago (see infra), it is clear that there exist at least some new or changed facts. Those include the fact that there is now no longer any need to avoid tipping off potential targets of any ongoing criminal investigation, no continuing risk of interfering with the grand jury's integrity and freedom to deliberate, and no danger of intimidation of, or subornation of perjury from, grand jury witnesses. The court thus concludes that petitioner has stated a basis for renewal of his prior applications.

The court rejects the intervenors' assertion that the doctrine of the law of the case bars the application for renewal. The court agrees with petitioner's observation that the doctrine of

---

**13.** On the other hand, the court must express its skepticism of the intervenors' suggestion that, because of the passage of time, the Attica investigation is no longer in the forefront of public consciousness and thus no longer a matter of legitimate public interest.

the law of the case, "a kind of intra-action res judicata"[14] (*see People v Evans*, 94 NY2d 499, 502 [2000], *rearg denied* 96 NY2d 755 [2001], citing Siegel, NY Prac § 448 at 723 [3d ed]), self-evidently cannot constitute an impediment to renewal per se (*see Ferguson v Shu Ham Lam*, 59 AD3d 388, 389 [2d Dept 2009]; *see also Foley v Roche*, 86 AD2d 887 [2d Dept 1982], *lv denied* 56 NY2d 507 [1982]), or else there would be no such procedural vehicle as renewal. Of course, there is such a procedural device as a motion to renew, which may be based on a showing of new facts or a change in the governing law, the latter showing, at least, being one that conceptually overcomes any assertion of the law of the case (*see Stern v Charter Oak Fire Ins. Co.*, 59 AD3d 930, 931-932 [4th Dept 2009]; *see also Clinkscale v Sampson*, 104 AD3d 722, 723 [2d Dept 2013], citing *Wells Fargo Bank Minn., N.A. v Perez*, 70 AD3d 817, 817 [2d Dept 2010], *lv denied* 14 NY3d 710 [2010], *cert denied* 562 US —, 131 S Ct 648 [2010]). By the same token, the court must reject the intervenors' notion that the doctrine of laches bars the request for renewal (*see Ferguson*, 59 AD3d at 389; *see generally Arias-Paulino v Academy Bus Tours, Inc.*, 48 AD3d 350 [1st Dept 2008]). The intervenors have failed to demonstrate that they have detrimentally changed their position since the original determinations or that they would otherwise be prejudiced by the delay in seeking renewal and the modification of the initial determinations (*see Skrodelis v Norbergs*, 272 AD2d 316, 316-317 [2d Dept 2000]; *cf. Matter of Linker*, 23 AD3d 186, 189 [1st Dept 2005]; *see generally Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801 [2003], *cert denied* 540 US 1017 [2003]).

The court further must reject the intervenors' notion that renewal does not lie here because the Attorney General seeks relief different from that originally sought by him. It is true that, before Justice Marshall, the Attorney General proposed the redaction from the publicly released version of the Meyer Report of all references to grand jury evidence. However, that

---

14. "The doctrine of the 'law of the case' is a rule of practice, an articulation of sound policy that, [once] an issue is . . . judicially determined, that should be the end of the matter as far as Judges and courts of co-ordinate jurisdiction are concerned" (*Martin v City of Cohoes*, 37 NY2d 162, 165 [1975], *rearg denied* 37 NY2d 817 [1975], *mot to amend remittitur denied* 37 NY2d 818 [1975]). This court reiterates that it sits in this matter as the successor to the now unavailable judges who ruled on the two prior applications. As such, the motion to renew is appropriately addressed to this court (*see* CPLR 2221 [a]).

was only because the Attorney General at the time was paying heed to the affirmed order of Justice Ball. Clearly, in his original application before Justice Ball, the Attorney General contended, however ambivalently, that volumes 2 and 3 of the Meyer Report should be released with minimal if any redactions. Just as clearly, upon appealing from Justice Ball's order, the Attorney General made the argument (fully considered by the Fourth Department) that the grand jury materials should be released along with the balance of the Meyer Report (*see Matter of Carey [Fischer]*, 68 AD2d at 229). Thus, this court perceives no fatal inconsistency between the Attorney General's positions then and now.

Finally, the court notes the intervenors' argument that this court lacks authority to modify a decision of the Appellate Division. This court of course concurs with that principle. Nonetheless, the better view is that the principle does not preclude the request for renewal (*see Davi v Occhino*, 116 AD3d 651, 652 [2d Dept 2014] [held: a "court of original jurisdiction may entertain a motion for leave to renew based on new facts even after an appellate court has affirmed the original order"], citing *Specialized Realty Servs., LLC v Town of Tuxedo*, 106 AD3d 987 [2d Dept 2013], and *Sealey v Westend Gardens Hous. Dev. Fund Co., Inc.*, 97 AD3d 653, 654-655 [2d Dept 2012]; *but see Senf v Staubitz*, 11 AD3d 997 [4th Dept 2004]).[15] However, the principle certainly does occasion an inquiry into which aspects of petitioner's requests for renewal and modification would undermine or nullify the Appellate Division's decision and which aspects would actually effectuate that decision (*see infra*).

On the basis of the foregoing, the court will grant renewal of the prior applications.

---

**15.** However, a corollary to the rule that renewal is not per se precluded in these circumstances is the principle that, on a post-appeal motion to renew,

"the movant bears a heavy burden of showing due diligence in presenting the new evidence to the Supreme Court in order to imbue the appellate decision with a degree of certainty (*Derby v Bitan*, 112 AD3d 881, 882 [2013], quoting *Levitt v County of Suffolk*, 166 AD2d 421, 423 [1990]; *see Specialized Realty Servs., LLC v Town of Tuxedo*, 106 AD3d at 988; *Abrams v Berelson*, 94 AD3d 782, 784 [2012]; *Andrews v New York City Hous. Auth.*, 90 AD3d 962, 963 [2011])" (*Davi*, 116 AD3d at 652 [internal quotation marks omitted]).

That corollary pertains to the Attorney General's request for permission to publish the grand jury evidence that Justice Ball and the Appellate Division ordered redacted from the Meyer Report.

Whether the Court Should Permit the Release of Grand Jury
Information Set Forth in the Meyer Report

CPL article 190 governs the conduct of a grand jury and of
the persons that may appear before that body, and it generally
requires that all grand jury proceedings remain secret. Thus,
CPL 190.25 (4) (a) provides, in pertinent part:

> "Grand jury proceedings are secret, and no grand
> juror, or other person [authorized to be present in
> or about a grand jury room or proceeding, or public
> officer or public employee] may, except in the lawful
> discharge of his duties or upon written order of the
> court, disclose the nature or substance of any grand
> jury testimony, . . . or other matter attending a
> grand jury proceeding."[16]

> "[S]ecrecy has been an integral feature of Grand
> Jury proceedings since well before the founding of
> our Nation (*Pittsburgh Plate Glass Co. v United
> States*, 360 US 395, 399; see Calkins, Grand Jury
> Secrecy, 63 Mich L Rev 455; Comment, Secrecy in
> Grand Jury Proceedings, 38 Ford L Rev 307)" (*Mat-
> ter of District Attorney of Suffolk County*, 58 NY2d
> 436, 443 [1983]; *see People v Fetcho*, 91 NY2d 765,
> 769 [1998]).

So strong are the principle of grand jury secrecy and the policies
underlying it that unauthorized disclosure of grand jury evi-
dence is a felony in this state (*see* Penal Law § 215.70; *see gener-
ally Matter of District Attorney of Suffolk County*, 58 NY2d at
443 n 6).

The general rule with regard to the secrecy of grand jury evi-
dence and proceedings exists for the protection of the persons

---

**16.** The statute goes on to provide that
"[f]or the purpose of assisting the grand jury in conducting its
investigation, evidence obtained by a grand jury may be indepen-
dently examined by the district attorney, members of his staff,
police officers specifically assigned to the investigation, and such
other persons as the court may specifically authorize. Such evi-
dence may not be disclosed to other persons without a court or-
der" (CPL 190.25 [4] [a]; *see* Judiciary Law § 325 [1] [allowing
dissemination of grand jury transcripts to district attorney but to
no one else without court order]; *see also* Executive Law § 63 [2]
[permitting Attorney General to appear before grand jury and
exercise all powers and duties of district attorney in these cir-
cumstances]).
The statute further dictates that nothing therein "shall prohibit a witness
from disclosing his own testimony" (CPL 190.25 [4] [a]).

*and the essential functions of the various players in the grand jury system, including: the grand jurors themselves* (*see* CPL 190.05, 190.25 [1]); the supervising criminal "court and the district attorney," who constitute the exclusive "legal advisors of the grand jury" (CPL 190.25 [6]); the witnesses before the grand jury (*see* CPL 190.25 [2]); and, of course, any unindicted target of the grand jury investigation, whether or not such target has testified (*see Matter of District Attorney of Suffolk County*, 58 NY2d at 443). The most oft-mentioned purposes or rationales for preserving grand jury secrecy include the:

> "(1) prevention of flight by a defendant who is about to be indicted; (2) protection of the grand jurors from interference from those under investigation;[17] (3) prevention of subornation of perjury and tampering with prospective witnesses at the trial to be held as a result of any indictment the grand jury returns; (4) protection of an innocent accused from unfounded accusations if in fact no indictment is returned; and (5) assurance to prospective witnesses that their testimony will be kept secret so that they will be willing to testify freely. (See, e.g., *People ex rel. Hirschberg v Board of Supervisors*, 251 NY 156, 165; *Matter of Temporary State Commn. of Investigation*, 47 Misc 2d 11, 14, supra.; *Matter of Attorney-General of U.S.*, 160 Misc 533, 534; *People v Ewald*, 144 Misc 657, 660; *United States v Amazon Ind. Chem. Corp.*, 55 F2d 254, 261; see, also, 8 Wigmore, Evidence [McNaughton Rev., 1961], §§ 2360-2362.)"
> (*People v Di Napoli*, 27 NY2d 229, 235 [1970]; *see Matter of Carey [Fischer]*, 68 AD2d at 227; *see also Fetcho*, 91 NY2d at 769; *Matter of District Attorney of Suffolk County*, 58 NY2d at 443).

In furtherance of the foregoing interests, both the witnesses before the grand jury and the target of the grand jury investigation are accorded standing to challenge the proposed disclosure of grand jury evidence (*see Matter of District Attorney of Suffolk County*, 58 NY2d at 443). In other words, "the rule of secrecy applies," and enforcement-related standing is accorded, "equally to either one who gives evidence or to one concerning whom evidence is given" (*Matter of District Attorney of Suffolk County*, 58 NY2d at 443). With respect to upholding secrecy for the protection of a grand jury target, the Court of Appeals has pronounced it "essential that one threatened with stigmatiza

---

**17.** That interest or objective has more generally been articulated as that of "ensuring the independence of Grand Juries" (*Matter of District Attorney of Suffolk County*, 58 NY2d at 444).

tion by unwarranted disclosure be accorded an opportunity to enforce the confidentiality [that the statute] is designed to secure (see *Douglas Oil Co. v Petrol Stops Northwest*, 441 US 211, 218, n 8; cf. *Matter of Hynes v Karassik*, 47 NY2d 659)" (*Matter of District Attorney of Suffolk County*, 58 NY2d at 443). With regard to upholding secrecy for the protection of a grand jury witness, the Court of Appeals has more generally noted that standing is conferred upon anyone who might suffer injury as a result of a violation or an "abuse" of a "statutory right" and whose interests might "fall within the 'zone of interest' protected by the legislation" (*id.* at 442, *affg* 86 AD2d 294, 297 [2d Dept 1982]).

Nevertheless, the secrecy of grand jury proceedings is not absolute (*see Di Napoli*, 27 NY2d at 234; *Matter of District Attorney of Suffolk County*, 58 NY2d at 443). The determination of whether disclosure of grand jury matters should be permitted is addressed to, and rests in, the court's discretion[18] (*see Di Napoli*, 27 NY2d at 234, citing *Matter of Quinn [Guion]*, 293 NY 787 [1944], *affg* 267 App Div 913 [2d Dept 1944], *Matter of Temporary State Commn. of Investigation*, 47 Misc 2d at 14 [Nassau County Ct 1965], *People v Behan*, 37 Misc 2d 911, 918 [Onondaga County Ct 1962], *Matter of City of New Rochelle*, 35 Misc 2d 254, 256 [Westchester County Ct 1962], and *Matter of Third Dec., 1959, Grand Jury*, 20 Misc 2d 475, 476 [Ct of General Sessions, NY County 1960]). As indicated, pursuant to CPL 190.25 (4), the court may authorize the revelation of the nature and substance of in-person testimony and other evidence considered by the grand jury, or any other matter attending a grand jury proceeding, in such circumstances and to such persons as the court may deem it appropriate. Nevertheless, "a presumption of confidentiality attaches to the record of Grand Jury proceedings" (*Fetcho*, 91 NY2d at 769; *see also* CPL 190.25 [4] [a]). In order to overcome that presumption, the applicant for disclosure must demonstrate "a compelling and particularized need for access" to the grand jury material (*Fetcho*, 91 NY2d at 769; *see Matter of District Attorney of Suffolk County*, 58 NY2d at 444).

> "However, just any demonstration will not suffice. For it and the countervailing policy ground it reflects must be strong enough to overcome the presumption of confidentiality. In short, without the

---

**18.** Here, the court is not really being asked to exercise its own discretion concerning what portions of the entire Attica grand jury record should be unsealed, but rather is being asked to approve the discretionary selections made by Meyer.

initial showing of a compelling and particularized need, the question of discretion need not be reached, for then there simply would be no policies to balance" (*Matter of District Attorney of Suffolk County* at 444).

Thus, in exercising its discretion, the court must balance the competing interests involved, i.e., the public interest in disclosure against that in preserving secrecy. It is only when the public interest in disclosure outweighs the public interest favoring secrecy will disclosure be permitted (*see id.* at 444; *Di Napoli*, 27 NY2d at 234). In capsule, then,

"[t]he presumption [of secrecy] can be overcome only by [the applicant's] demonstration of 'a compelling and particularized need for access' to the Grand Jury material (*Matter of District Attorney of Suffolk County, supra*, 58 NY2d at 444). If [the applicant] meets that initial burden, the trial court must then balance the public interest for disclosure against the public interest favoring secrecy (*id.*). Where the former outweighs the latter, the trial court may exercise its discretion to direct disclosure (*id.*)" (*Fetcho*, 91 NY2d at 769).

The mere fact that the disclosure is sought by a government agency (even a prosecutorial agency that was itself involved in the grand jury presentation) will not necessarily warrant the breach of grand jury secrecy, nor will the mere general assertion that disclosure will be in the public interest (*see Matter of District Attorney of Suffolk County*, 58 NY2d at 444-445). Nor will disclosure be compelled even by a demonstration that the requested disclosure will serve an unquestionably valid public purpose or interest, at least not where there has been no showing that "sources other than the Grand Jury minutes are inadequate to provide the information" sought by the applicant (*see Matter of District Attorney of Suffolk County*, 58 NY2d at 444-445). Those governing principles are illustrated by the holding of the aforementioned case, in which the Court of Appeals denied the Suffolk County District Attorney's application for permission to utilize grand jury testimony in furtherance of a county legislature-authorized civil Racketeer Influenced and Corrupt Organizations Act (RICO) (18 USC § 1961 *et seq.*) suit against various targets of a grand jury investigation into political corruption (*see id.* at 444-445 and cases cited therein, including *Matter of City of Buffalo [Cosgrove]*, 57 AD2d 47 [4th Dept 1977] [court denied request by city for access to minutes of a

grand jury investigation into "no-show" municipal jobs], and *Matter of Corporation Counsel of City of Buffalo [Cosgrove]*, 61 AD2d 32 [4th Dept 1978] [court denied request by city for disclosure of grand jury testimony of police officers, including one investigated for homicide and later indicted for perjury, for use in departmental disciplinary proceedings against the officers]).

From the foregoing holdings, it is clear that "disclosure is 'the exception rather than the rule' " (*Matter of District Attorney of Suffolk County*, 58 NY2d at 444). Nonetheless, sufficient justifications for court-permitted disclosure of grand jury evidence have included, for example: the facilitation of a public investigation (*see Di Napoli*, 27 NY2d at 233-235 [permitting disclosure of grand jury evidence to Public Service Commission investigating effects upon ratepayers of bid-rigging in electrical power industry (the subject of the grand jury investigation)]); the validation of invocations of immunity and/or testimony in (Attica-related) civil litigation (*see Jones v State of New York*, 79 AD2d 273 [4th Dept 1981]); the facilitation of possible disciplinary action against public employees (*Matter of Scotti*, 53 AD2d 282, 287-289 [4th Dept 1976] [upholding limited release of grand jury minutes to Attica special prosecutor for transmittal to prison authorities for purpose of deciding whether to institute disciplinary proceedings against prison guards]);[19] the facilitation of the removal of an individual from public office (*see Matter of Quinn [Town of Mt. Pleasant]*, 267 App Div 913 [1944] [permitting release of subject official's grand jury testimony for use by citizens seeking such removal]); the facilitation of a court's discipline of an admitted attorney (*see Matter of Epstein*, 37 AD2d 333 [1st Dept 1971], *appeal dismissed* 29 NY2d 875 [1971], *cert denied* 405 US 1046 [1972] [authorizing release of relevant grand jury testimony of attorney himself]); and, in one case, mere general historical interest (*see People v Lindsay*, 188 Misc 2d 757 [Cattaraugus County Ct 2001] [disclosing grand jury testimony in 65-year-old successful capital murder case to ensure accuracy of movie script focusing on case]).

Most of the aforementioned judicial holdings and articulations of principles for deciding whether grand jury evidence may be accessed and used for various governmental purposes are not directly on point to this case. Here, the Attorney Gen-

---

**19.** As noted, supra, however, the grand jury evidence in question evidently was never actually used for such purposes, the Governor having precluded such disciplinary action.

eral does not really seek access to the grand jury evidence, even the limited portions of it referenced in the Meyer Report, for he as the former prosecuting authority presumably already possesses, or at least has lawful access to, the entire grand jury record (see CPL 190.25 [4]; Judiciary Law § 325 [1]). The Attorney General certainly already possesses the entire Meyer Report, including such portions of it as are devoted to detailing certain grand jury evidence. After all, the Attorney General is the one to whom the report was delivered in the first place, and he is the one who furnished it to this court for its in camera review. Clearly, court-permitted access to the subject grand jury material on the part of the applicant himself is not what we are talking about here. Moreover, petitioner in no way seeks to make some official "use" of the grand jury evidence in question according to any conventional definition of that word. Rather, the application before this court is one for the unsealing and public revelation of such grand jury evidence as is quoted, paraphrased, or referenced in the Meyer Report, for the public's information and supposed edification, but not really for anyone's (except historians') use.

Therefore, the cases that are by far most pertinent to the resolution of the instant application are the prior decisions of Justice Ball and of the Fourth Department in prior iterations of this very matter (see Matter of Carey [Fischer], 68 AD2d 220 [1979], affg 92 Misc 2d 316 [1977]), as well as other decisions concerned with the public dissemination of grand jury evidence (see e.g. Matter of NYP Holdings, 196 Misc 2d 708, 712 [Sup Ct, Kings County 2003] [court denied application by news media for public release of grand jury evidence consisting of video and audio tapes of suspects in still pending court corruption case]; Matter of Hynes [Patrolmen's Benevolent Assn.], 179 AD2d 760 [2d Dept 1992], lv denied 79 NY2d 757 [1992] [court denied district attorney's application for public release of minutes and records of grand jury that had declined to indict a Hasidic man whose vehicle struck and killed African-American child, sparking Crown Heights riots]; see also Lindsay, 188 Misc 2d 757 [court permitted disclosure of grand jury minutes in 65-year-old capital murder case for purpose of writing movie screenplay]). Nevertheless, all of the cases cited hereinabove, especially the Court of Appeals' decisions, are highly instructive for what they reveal about how legally difficult it is for public officials, even those engaged in law enforcement, to access and use presumptively secret grand jury evidence even for a specific and demonstrably important governmental purpose.

As the court applies the policy rationales for maintaining grand jury secrecy to the case before it, it is evident that, as of today—literally decades following the disbanding of the Attica grand jury and the considered determination by the Governor and Attorney General not to further criminally pursue anyone in connection with the Attica uprising and its aftermath—"there is no danger of any escape of persons who may be indicted, no [danger of] interference with the grand jury's freedom to deliberate, [and] no danger of subornation of perjury" (*Di Napoli*, 27 NY2d at 235). Indeed, "[i]mplicit in the absence of objection on the part of [any prosecutorial agency] is the lack of detriment in respect of any prospective criminal proceeding" (*People v Di Napoli*, 35 AD2d 28, 31 [1st Dept 1970], *affd and quoted in* 27 NY2d at 235-236)—at least one instituted by state, as opposed to possibly by federal, authorities.[20]

■ Clearly, however, other considerations or interests supporting the preservation of grand jury secrecy remain unextinguished. The court has in mind such considerations as the chilling effect of disclosure upon future grand jury witnesses, the potential danger that disclosure might present to the physical safety of grand jury witnesses and targets in the Attica investigation, and the potential damage to the reputations of those individuals who were targets or potential targets of the grand jury but who were never indicted. The Attorney General makes every rhetorical effort to minimize those considerations by repeatedly emphasizing the passage of decades since the conclusion of the grand jury investigation as well as the undeniable historical importance of the events surrounding the Attica uprising and its aftermath. However, despite the passage of such time, the Attorney General cannot negate or overcome the pertinent public interests. In the view of this court, it is no less true now than it was at the time of the Appellate Division's decision that there is in this case "a continuing need to protect unindicted individuals from unfounded accusations against them [in the public realm given that] some of the evidence pertinent to Judge Meyer's investigation relates to individuals who were accused [before] but [not ultimately indicted] by the Grand Jury" (*Matter of Carey [Fischer]*, 68 AD2d at 228). Just as the Fourth Department noted at the time, "because the proceedings terminated before the investigation was concluded,

---

**20.** The court is mindful of how long after the end of the civil rights era, and following abortive or unsuccessful state prosecutions, some violent segregationists were prosecuted by federal authorities on civil rights charges.

some accusations were never resolved one way or the other. They remain in limbo" (*id.*). As the Fourth Department further noted at the time, "[p]erhaps, with skillful redaction, the identity of the affected persons could be concealed and their reputations protected,[21] but it is doubtful that it could be done successfully given the extensive writing that has occurred on the subject of Attica" (*id.*). If that was true then (and it was), it is even more true today, when the historical record is, if anything, even more developed than it was in 1979. Finally, it remains true that both the still-living individuals who came forward to testify before the Attica grand jury in the 1970s, as well as those citizens who might be called upon to give their evidence in the event that a tragedy of similar dimension occurs in the future, are in need of assurance that they may, after so testifying, live out their lives "without fear of reprisal or intimidation" (*id.* at 229; *see Jones*, 79 AD2d at 276).[22]

Even more fundamental to the outcome of this application, however, is that the Attorney General has not made anything resembling a "showing of a compelling and particularized need" for disclosure of the grand jury evidence referenced in the Meyer Report (*Matter of District Attorney of Suffolk County*, 58 NY2d at 444-445).[23] That failure or inability of the Attorney General to make that necessary showing inheres in "the nature of the disclosure sought here" (*Matter of Carey [Fischer]*, 68 AD2d at

---

**21.** Again, at the time of the Appellate Division's decision, the Attorney General was proposing (just as he now proposes) to redact the names of grand jury witnesses and targets, but not to redact any other references to grand jury evidence, from the version of the Meyer Report to be released to the public.

**22.** The Attorney General acknowledges at least the colorability of the threats to the reputations and physical safety of grand jury witnesses and targets. It is on that basis that the Attorney General asks this court to establish a judicial procedure whereby grand jury witnesses and targets could inspect volumes 2 and 3 of the Meyer Report in their proposed or court-ordered redacted form and then advise the Attorney General and the court of any specific objections that they still may have to the publication of the volumes.

**23.** According to petitioner, the "compelling and particularized need" for public access to the grand jury references contained in volumes 2 and 3 of the Meyer Report is that

"(1) these volumes contain historically significant information relating to the claim of a state-sanctioned cover up in the Attica prosecutions that later served as the basis for unprecedented State prosecutorial and Executive action; (2) the information is not obtainable from any other source; and (3) the Grand Jury references cannot be fully redacted without rendering the volumes useless as a historical record."

228)—i.e., disclosure for the purpose of better informing the public and augmenting the historical record. That is a type of disclosure that, in the words of the Fourth Department in 1979, "far exceeds anything previously authorized by any court" (*id.*). As the Fourth Department noted at the time,

> "No case is cited . . . in which a court has authorized dissemination of Grand Jury evidence to the public generally or even a substantial segment of the public. Perhaps the closest that any court has come to permitting public release of Grand Jury evidence was the disclosure permitted to a group of interested citizens who sought removal of a village tax collector (*Matter of Quinn [Guion]*, 293 NY 787, *affg* 267 App Div 913). But even in that case the disclosure was to resident taxpayers who had initiated a statutory removal proceeding pursuant to section 36 of the Public Officers Law so that they might prosecute a court action. Significantly, Chief Judge Fuld, speaking for the court in *Di Napoli* (*supra*, p 237), cautioned, 'Quite obviously, our affirmance [of the Appellate Division's order authorizing release of the testimony to the commission] will not sanction any general disclosure or widespread publication of the minutes.' [The Attorney General] here seek[s] precisely that which the Chief Judge said was impermissible, generalized publication of portions of Grand Jury evidence" (*Matter of Carey [Fischer]*, 68 AD2d at 228-229).

For the foregoing reasons, this court must conclude that the Attorney General has failed to meet his threshold burden of showing a compelling and particularized need for disclosure where the "only articulated purpose for the release" of the grand jury evidence in question "is to inform the public of its content" (*Matter of NYP Holdings*, 196 Misc 2d at 712 [denying news media's request for public release of grand jury evidence in still pending court corruption case]; *see Matter of Hynes [Patrolmen's Benevolent Assn.]*, 179 AD2d at 761 [denying district attorney's application for public release of evidence placed before grand jury that had declined to indict in matter that had sparked notorious Crown Heights riots]).

It may well be that the release of the grand jury evidence cited in the Meyer Report might add to the public's understanding of the course of the Attica investigation and prosecution. It is certainly the case that, as argued by petitioner, the grand jury references in question constitute an integral part of the report's

text and help form the basis for Meyer's findings. It may also be the case that there is no alternative source for the information set forth in the grand-jury-referencing passages of volumes 2 and 3. Those observations, however, do not by themselves override the law's general policy of preserving grand jury secrecy. In any event, it must be noted that, in comparison to the 33,000 pages of grand jury transcripts generated in the Attica investigation and reviewed by Meyer, the portion of the grand jury evidence that is actually referred to in the Meyer Report is, by any reckoning, minuscule. It may well be, then, that release of the limited grand jury evidence set forth in the Meyer Report might actually detract from the public's understanding of the course of the Attica investigation and prosecution, or at least have a distorting effect upon such understanding relative to what actually transpired before the grand jury. As noted by Justice Ball, purely subjective considerations went into the selection, out of the voluminous grand jury record produced over several years of investigation, of those relatively small portions of the grand jury material that made their way into the Meyer Report (*see Matter of Carey*, 92 Misc 2d at 326, 328-330). Meyer's charge was to render conclusions about the merits of certain decisions made by the Attica prosecutors, one of whom had quite controversially pitted himself against his superiors. It stands to reason, therefore, that Meyer chose for inclusion or reference in his report—or at least doubtless emphasized—only those portions of the grand jury record that best supported Meyer's "personal opinions and conclusions as to the veracity and judgment of the persons involved" (*Matter of Carey*, 92 Misc 2d at 328). For that reason alone, this court feels as though petitioner would almost certainly be disappointed in his hope that release of the limited grand jury evidence referenced in the Meyer Report will somehow finally and fully flesh out the historical record of the Attica prison uprising. As noted by Justice Ball, the Meyer Report "does not set forth the full story dealing with Attica" (*Matter of Carey*, 92 Misc 2d at 328).

This court must further point out that Meyer's report, including his self-selected references to limited grand jury materials, cannot possibly be the last word on even the Attica investigation itself. The court has little doubt that if Bell had written the history of the Attica investigation after having been given access to the 33,000-page-plus grand jury record, he would have selected different threads of the grand jury evidence to support his thesis than Meyer chose to support his findings. This court

itself has not seen anything close to the entire grand jury record, nor would the public even if the court perchance were to authorize the publication of the entire Meyer Report. As noted, supra, the court is not being asked to consider the entire grand jury record before authorizing, in the exercise of its own discretion, the release of that entire record or even *judicially* selected portions of it. Rather, the court is being asked to approve the release of only snippets of the grand jury record cherry-picked and editorialized upon by someone else in the exercise of his investigative discretion. That this court is not at all willing to do, certainly not for the ostensible objectives of completing the historical record of the Attica investigation and giving the public an opportunity to gauge for itself the fullness and fairness of the Meyer investigation.

Moreover, even if this court were to assume that the public would necessarily and unmitigatedly benefit from the release of the limited grand jury evidence in question, and even if this court were to acknowledge, as it must, the importance of the right of the public in a democracy to have access to information regarding such matters of great public concern as the Attica investigation (*see Matter of Carey [Fischer]*, 68 AD2d at 229), the court nonetheless would bear the responsibility of balancing the public's right to know and the supposed societal benefits of disclosure against those yet-prevailing societal interests that militate against public revelation of grand jury evidence. As the Fourth Department has authoritatively stated in this very matter:

> "The public's access to knowledge and the confidence it has in the conduct of public officials are matters of first importance in a democratic society. The cases demonstrate, however, that such considerations are customarily present in applications of this nature to a greater or lesser degree (see, e.g., *Matter of City of Buffalo*, 57 AD2d 47, *supra*; *Matter of Grand Jury of Erie County*, 192 Misc 857; *Matter of Bar Assn. of Erie County [Hagerty]*, 182 Misc 529; *Matter of Attorney-General of State of N.Y.*, 145 Misc 331). They do not necessarily justify disclosure. No less important is the obligation of the judicial branch of government to protect the reputations of persons accused of crimes but not indicted or convicted, and to protect the court's investigative machinery. The secrecy of the Grand Jury is jealously guarded because the confidentiality of its

proceedings must be ensured if it is to continue to be effective. Particularly is that so in investigations such as this which are the subject of broad publicity and which are highly sensitive. The Attica uprising, and the investigations and the criminal proceedings which followed it, were unique in the history of this State. No similar prosecution may ever occur in the future. But if it should, those persons possessing needed evidence must have the assurance that they may come forward without fear of reprisal or intimidation" (*Matter of Carey [Fischer]*, 68 AD2d at 229).

At an even more basic level of analysis, this court must point out that, if the public's right to know could be a paramount or overriding consideration here, there would not exist a general rule of grand jury secrecy in the first place. Nor, if the supposed societal benefit of maximizing the public's awareness could by itself trump all other considerations, would there exist a legal presumption against disclosure of grand jury evidence, let alone a rule providing that such presumption may be overcome only by a showing of a particularized and compelling need for disclosure. To adopt the Attorney General's position in this case would be to effectively displace the presumption against disclosure of grand jury evidence with a presumption favoring the earliest and widest public revelation of grand jury material, at least in the most important and notorious cases.

The facts and holding of the *Di Napoli* case, which is heavily relied upon by the Attorney General in support of his application, are to be distinguished from this case. In that case, the court-permitted disclosure followed the conviction of those targets of the grand jury investigation who later objected to disclosure of the grand jury evidence (*Di Napoli*, 27 NY2d at 234-235). Here, from among the law enforcement officials who were at least potential targets of the Attica criminal investigation, practically no one was ever indicted for let alone convicted of anything. Moreover, in *Di Napoli*, the disclosure allowed by the Court was not to the public generally, but rather to the Public Service Commission, as an aid to its lawful investigation into the effects of bid-rigging (the subject of the grand jury investigation) upon the public's electricity rates (*see id.* at 233-235). The Court of Appeals in *Di Napoli* took great pains to point out that it was in no way sanctioning "any general disclosure or widespread publication of the minutes," but merely was authorizing the Public Service Commission staff to peruse the minutes to

assist in its investigation and preparation for the public hearings, including for possible cross-examination of witnesses (*id.* at 237). Indeed, the Court of Appeals pointed out that it remained for anyone potentially prejudiced by the prospect of disclosure of particular grand jury evidence at the Public Service Commission hearing to make further court application to keep such evidence secret (*id.* at 238). Here, in contrast, the Attorney General seeks final and irrevocable authority to publicly disclose the presumptively secret grand jury evidence contained in the Meyer Report, albeit with the names of and other identifying information about grand jury witnesses and targets redacted.

Of far more precedential value in deciding the present application, this court feels, is the Court of Appeals' holding in *Matter of District Attorney of Suffolk County* (58 NY2d 436 [1983]). In that case, at the instance of witnesses or would-be witnesses before the grand jury, the Court of Appeals rejected an application for permission to access and utilize grand jury evidence in furtherance of a civil RICO suit against the targets of the grand jury investigation, which had focused on matters of criminal fraud and political corruption in the letting of sewer construction contracts by the County of Suffolk. The Court of Appeals did so despite the fact that it was the District Attorney, i.e., the criminal prosecutor, who was himself seeking to exploit the grand jury transcripts in the civil suit (the county legislature had asked the District Attorney to sue civilly). Further, the Court of Appeals denied disclosure despite the fact that the three objecting grand jury witness/targets had been indicted (and two convicted) for perjuring themselves before the grand jury, and despite the Court's recognition of a legitimate public interest in the county's efforts to recover damages from those who allegedly had defrauded county taxpayers (*see id.* at 443-445). Other cases in which the courts have upheld the secrecy of grand jury materials, despite requests for disclosure more limited than that requested in this case, and despite the articulations of needs or justifications more "compelling and particularized" than those given in this case, include: *Matter of City of Buffalo (Cosgrove)* (57 AD2d 47 [1977], *supra* [denying request by city for access to minutes of a grand jury investigation into "no-show" municipal jobs]); *Matter of Corporation Counsel of City of Buffalo (Cosgrove)* (61 AD2d 32 [1978], *supra* [denying request by city for disclosure of grand jury testimony of police officers, including one investigated for role in homicide and

ultimately indicted for perjury, for use in departmental disciplinary proceedings against the officers]); *Matter of Police Commr. of City of N.Y.* (131 Misc 2d 695, 703-704 [Sup Ct, NY County 1986] [similar holding in case of police officer indicted for but acquitted of official misconduct]); *Matter of Bar Assn. of Erie County (Hagerty)* (182 Misc 529 [Erie County Ct 1944] [denying bar association access to minutes of grand jury investigating operations of Buffalo City Court for evident purpose of advocating improvements in administration of justice]); and *Matter of Carey* (92 Misc 2d at 330 [denying release of Attica grand jury evidence, including that in Meyer Report, to Attica-related civil litigants]) *(see also Matter of Lustberg v Curry*, 235 AD2d 615 [3d Dept 1997] [denying access to grand jury materials to plaintiffs in civil suit versus district attorney]).

In the light of the foregoing authorities, which militate strongly against the publication of grand jury secrets, this court is left to address the other cases primarily relied upon by the Attorney General. In *Lindsay* (188 Misc 2d 757), on the application of the surviving son of the criminal defense counsel in the case, the court that presided over a 1935 indictment and prosecution of a certain defendant for capital murder authorized the release of the grand jury minutes to a Hollywood production company. In authorizing that disclosure, the court cited the fact that the murderer had been convicted and promptly executed 65 years earlier; that there had been no other suspected culprits in the case; that all of the grand jury witnesses were "likely" deceased; that the trial minutes themselves had been lost to posterity; that capital cases are generally of compelling public concern and interest; that the difference between the handling of a capital case then and now was particularly "fascinating"; that the District Attorney who actually prosecuted the capital case had previously released the grand jury evidence to the public (whether that was with court sanction or not is not revealed in the decision); and that in today's legal world, the grand jury minutes would have been supplied to the defense (meaning that the defense counsel's son would have been able simply to retrieve them from his deceased father's case file) *(id.* at 760). In granting the application for release of the grand jury minutes, the court concluded that, given the passage of time, any public interests in favor of maintaining secrecy—preventing a suspect's flight, protecting grand jurors from outside interference, preventing perjury and witness tampering, protecting the reputations of innocent/unindicted suspects, and assuring wit-

nesses that their testimony would be kept secret—simply lacked any continuing relevance (*id.*).

This court finds the facts in *Lindsay* to be fundamentally distinguishable from those of this case in two key respects. The first involves the passage of time. Whereas 65 years had elapsed since the grand jury presentation in *Lindsay*, only about 40 years have passed in this case. Thus here, unlike in *Lindsay*, not all of the grand jury witnesses are deceased (or "likely" so). Second, although the sole target of the grand jury proceedings in *Lindsay* had been convicted and executed, here there exist unindicted grand jury targets with persisting legitimate interests in preserving their physical safety and reputations.

By the same token, the court rejects petitioner's attempt to liken the facts of this case to those in *People v Cipolla* (184 Misc 2d 880 [Rensselaer County Ct 2000]). There, in ruling on an application by a newspaper publisher, the court permitted the public disclosure of certain grand jury evidence. The court did so, however, only after the grand jury targets had been tried and acquitted, and only after the grand jury evidence had been released for use by the defense in a federal civil lawsuit brought by the grand jury targets against others, including at least one public official, who allegedly created the allegedly corrupt evidence considered by the grand jury. In this case, in contrast, most of the apparent targets of the grand jury have not been tried (nor even indicted), the grand jury evidence in question has not already been released for some other purpose, and the integrity of the grand jury proceedings has not been placed in issue in some parallel litigation.

On the basis of the foregoing, the court must deny the Attorney General's request for permission to publish the grand jury evidence referred to in the Meyer Report.

Whether the Court Should Permit the Unsealing of Those Portions of the Meyer Report Not Referencing Grand Jury Evidence

█ This court strives, but struggles, to articulate a legal framework appropriate to the resolution of the crucial issue of whether the Attorney General should be permitted—or even needs permission—to publish volumes 2 and 3 of the Meyer Report once they are redacted, pursuant to CPL 190.25 (4) and repeated judicial order, of all of their references to grand jury evidence. To the court, the question basically revolves around the existence or nonexistence of a legal principle precluding the Attorney General from generally communicating with his con-

stituents on a matter of mutual interest, i.e., the content of the Attorney General's own internal report concerning the conduct of the Attorney General's own handling of a certain criminal investigation and prosecution. More particularly, the question is whether there is some legal principle—apart from the explicit statutory prohibition upon the revelation of grand jury secrets— authorizing this court to censor the Attorney General's public communications on that subject.[24] This court quite frankly is unaware of the existence of any such legal principle, and indeed would consider the postulation of such a principle to be preposterous. Certainly, no such principle is cited by the intervenors, nor is any adverted to by the Attorney General pursuant to his ethical obligation to apprise this court of controlling legal authority adverse to his own position. Most important, this court vainly searches Justice Marshall's decision and order for any citation of any such legal principle justifying that court's 1981 order directing that volumes 2 and 3 of the Meyer Report, even as stripped of their references to grand jury evidence, be "permanently sealed." The court thus must conclude that Justice Marshall had no legal authority to permanently prohibit the Attorney General from publicly disclosing those portions of the Meyer Report that do not refer to grand jury evidence. This court must further conclude that it has no such legal authority to disallow the Attorney General to publish the non grand-jury-referencing portions of the report.[25]

In reaching that conclusion in departure from Justice Marshall's order, this court notes the letter and spirit of Justice Ball's and the Appellate Division's earlier orders. Both of those courts had clearly contemplated the public release of volumes 2 and 3 of the Meyer Report once they were stripped of their references to grand jury evidence. Justice Ball's decision and order are replete with references to the eventual public release of those portions of the Meyer Report (see Matter of Carey, 92 Misc

---

**24.** As a public prosecutor, the Attorney General may have ethical obligations to meet in publicly commenting upon or otherwise divulging information about a pending criminal investigation (see Rules of Professional Conduct [22 NYCRR 1200.0] rule 3.6), but those obligations do not appear to be in play at this late date. Nor, in any event, are they obligations to be enforced by a court prospectively.

**25.** The court recognizes that its departure from Justice Marshall's determination on these grounds is far more akin to what would be done on a motion to reargue than on a motion to renew, but this court must iterate that it simply sees no legal or factual basis for adhering to Justice Marshall's determination permanently sealing volumes 2 and 3 of the Meyer Report in their entirety.

2d at 329-330; *see also* order of Sup Ct, Wyoming County, Ball, J., dated Dec. 22, 1977). It is true that the Appellate Division majority did not directly address those aspects of Justice Ball's order, but more important are the obvious analytical implications of the Appellate Division's affirmance thereof. Why, if the volumes in question might be kept "permanently sealed," would that court have bothered to analyze at length the issue of whether the grand jury secrets had to be redacted? Clearly, the appellate justices would not have addressed the matter in the manner in which they did unless they themselves were unanimously of the view that, as clearly contemplated by the Governor and the Attorney General from October 1975 on, volumes 2 and 3 of the Meyer Report were to be released to the public once the courts had had their say concerning the redaction of grand jury evidence therein. Thus, in ordering the Meyer Report to be sealed forever, Justice Marshall ruled not only in the evident absence of supporting legal authority but also in a manner irreconcilable with the spirit of the Appellate Division's order.

Intervenors nonetheless argue that, because the Meyer Report describes the activities of State Police officers who allegedly caused injury or death during the prison retaking, publication of the report (even apart from any references to grand jury evidence) "would expose the state troopers to public obloquy, insult and possible physical danger from either extremist groups or disturbed individuals." That may be true, but it is crucial to note that the public interests in not exposing grand jury witnesses and targets to reputational injury and threats to their physical safety are merely policies or interests in service or support of a specific rule of law favoring the preservation of grand jury secrets. They are not policies or interests warranting this court in more generally precluding the Attorney General from communicating with his constituents on matters of mutual concern to them. As noted, supra, there exists no legal principle that would warrant such preclusion.

Intervenors further argue, as Justice Marshall essentially concluded, that "[v]olumes 2 and 3 should not be released as they will be so macerated and mutilated [by the excision of grand jury references] that [publication] will be pointless and not serve any legitimate public interest."[26] That also may be true, especially inasmuch as the Attorney General proposes (in-

---

**26.** *See also Matter of Carey (Fischer)*, 68 AD2d at 234 (Doerr, J., dissenting) ("Redaction of [grand jury references] as ordered by the court below

dependent of any court-ordered redaction of grand jury evidence) to redact the names of and identifying information about grand jury witnesses and targets throughout the report. Indeed, the court's overall impression of volumes 2 and 3, once they are purged of grand jury references and most names, is of a writing so riddled with blanks as to be incomprehensible to the reader. However, and again, this court knows of no legal principle permitting this court to generally control in what manner the Attorney General communicates with his constituents.

## Whether the Court Should "Require" the Attorney General to Redact the Names and Identities of Grand Jury Witnesses and Targets Mentioned in Those Portions of the Meyer Report Not Referencing Grand Jury Evidence

In renewing its prior applications[27] and seeking modification of Justice Ball's and Justice Marshall's respective orders, petitioner explicitly asks this court "to require the redaction by" the Attorney General from volumes 2 and 3 of the Meyer Report "of only the names of Grand Jury witnesses and certain persons referenced therein as well as other specific identifying information."[28] Inasmuch as the court has rejected the Attorney General's request for the release of those portions of the Meyer Report as refer directly to grand jury materials, and inasmuch as this court has determined it to be within the power of the Attorney General to release the balance of the Meyer Report, the issue becomes whether the Attorney General legally *must* redact, in addition to all grand jury references, the names of and other identifying information about grand jury witnesses and targets mentioned in those portions of the Meyer Report not referencing grand jury materials.

---

and approved by the majority would in many instances reduce the report to an inane compilation of words and phrases and consign the entire Meyer investigation to a futile gesture").

27.  As far as renewal is concerned, the court notes that the Attorney General did not formally seek or even propose the redaction of specific names as part of the original application before Justice Ball, nor as part of the subsequent application before Justice Marshall (in the initial application, the Attorney General at most observed that threats to the personal safety of grand jury witnesses or targets "may be obviated if the names in Volumes 2 and 3 are deleted to protect the safety of the law enforcement personnel and their families"). Thus, petitioner's instant request for an order requiring him to redact the names of and identifying information about grand jury witnesses and targets—and his proposal to redact specific names and identifying information prior to publication—seems somewhat inconsistent with his positions on the earlier applications, although certainly consistent with his position before the Appellate Division (*see Matter of Carey [Fischer]*, 68 AD2d at 224).

28.  *See* nn 7, 8, 11, *supra*.

The court sees no legal basis for it to "require" the Attorney General to redact such names and identities. As noted, supra, the Appellate Division previously stated in this matter that the Attorney General's and/or Governor's "volunt[ary] . . . redact[ion] [of] individual names appearing in the report, as necessary . . . to avoid injury to reputations" was "a matter for [their] determination, not the court's" (*Matter of Carey [Fischer]*, 68 AD2d at 224). This court can only conclude that the Appellate Division was of the view that individuals named in the Meyer Report, including individuals who happened to be grand jury witnesses or targets, possessed no statutory or due process right against the disclosure of their names or identities in connection with the publication of those portions of the Meyer Report that do not reference grand jury proceedings. Although the Appellate Division posited that such redaction of names was a legal matter up to the Attorney General and Governor "at this time," this court cannot interpret the quoted phrase as meaning only in 1979 and not now, some 35 years later. The instant matter is in essentially the same procedural posture as the initial matter was, with a court's being asked to rule on a request by the Attorney General to publish all or virtually all of volumes 2 and 3 of the Meyer Report, but with the court's ruling that grand jury references in the report may not be revealed. Therefore, this court must reiterate that whether to redact the names of grand jury witnesses and targets from the publishable portions of the Meyer Report remains "a matter for [the Attorney General's] determination, not the court's" (*id.*).

Indeed, shortly after so expressing its view on the matter in its decision upholding Justice Ball's order, the Appellate Division separately dealt with an application by a union of correction officers (a party to the Attorney General's original application and to the appeal) seeking the amendment of the Appellate Division's order of affirmance "so as to require the redaction from Volumes 2 and 3 of the [Meyer Report], prior to their release by the Governor, of the names of all persons who were investigated by the two special Attica Grand Jury's but who were not indicted, and [of] witnesses' names." The union noted in support of that request for relief that the proposed order submitted for Justice Ball's signature had contained such provision, which had been struck out by Justice Ball.[29] The union further noted that a judicial directive for the redaction of the

29. Of course, Justice Ball's striking of the provision in question from his order was an implicit denial of the union's demand that the names of all cor-

names of grand jury witnesses and targets was necessary in order to effectuate the Appellate Division's affirmance of (or at least its rationale for affirming) Justice Ball's order directing the redaction of grand jury evidence from volumes 2 and 3. The union specifically argued "that such redaction must be required, not left to volunteerism by those who are to release the Report."

In denying the union's motion, the Appellate Division stated: "In view of the offer of the Governor's counsel to redact the names of Grand Jury witnesses and unindicted targets of the investigation, we see no need for the relief requested" (unpublished mem/order of Appellate Division, Fourth Department, dated July 6, 1979). In the view of this court, that ruling had the effect of converting what might otherwise have been dictum in the Appellate Division's initial decision into an explicit holding that the general redaction of the names of grand jury witnesses and targets was not statutorily, and was not to be judicially, required of petitioner. Therefore, this court cannot and will not grant the relief requested by the Attorney General, i.e., an order requiring the redaction of the names of and other identifying information about grand jury witnesses and targets from the publishable portions of the Meyer Report.

Nevertheless, this court must recognize that what the Attorney General in essence seeks is an order permitting him to publish such portions of volumes 2 and 3 of the Meyer Report as do not refer to grand jury evidence and proceedings, albeit after the Attorney General's redaction therefrom of the names of and identifying information about grand jury witnesses and targets. Such publication and such redaction of names, as the Appellate Division made clear and this court reiterates, are matters for the Attorney General to determine.

Whether the Court Should Establish a Procedure for Affected Persons to Review the Redacted Version of the Report before Publication

The Attorney General asks this court to establish and supervise a procedure whereby persons "affected" by the disclosure of the proposed redacted version of volumes 2 and 3 of the Meyer Report may peruse the report before its publication and "be heard" concerning the sufficiency of the proposed redactions. At least one of the intervenors joins in that request.

This court declines the invitation to establish and supervise such a judicial procedure. The court has unequivocally ruled out

rection officers be redacted from the Meyer Report before any publication (*see Matter of Carey*, 92 Misc 2d at 322).

any publication of the references to grand jury evidence contained in volumes 2 and 3 of the Meyer Report. The court has further outlined that no legal principle precludes the Attorney General from publicly disclosing the balance of volumes 2 and 3, i.e., those portions not referencing grand jury evidence. The court has also now reminded the Attorney General (and the intervenors) of the Appellate Division's multiple indications that it is for the Attorney General to decide whether, as now concretely proposed by him, to redact the names of and identifying information about grand jury witnesses and targets, i.e., such names or identifications appearing even in portions of the Meyer Report that do not directly reference grand jury evidence. Inasmuch as it is legally up to the Attorney General whether to publish those portions of the Meyer Report that do not reference grand jury evidence, and inasmuch as it is legally up to the Attorney General whether to redact identifying information from such portions of the report, it is not this court's function to supervise the redaction/publication process. As this court perceives matters, the Attorney General has been nothing but fair in his procedural treatment of affected individuals in terms of giving them notice of this proceeding[30] and advocating their participation in a pre-publication review process. If the Attorney General desires to invite affected persons to peruse the publishable portions of the Meyer Report (say, at the Attorney General's own office or offices) prior to any publication, and if he desires to confer with such affected persons concerning the extent of any redactions or anything else—including the timing of any public release of the Meyer Report vis-à-vis any public rebuttal statements to be made by affected persons (cf. CPL 190.85 [3]; Civil Rights Law § 73 [5], [6])—he should feel free to do so without judicial oversight or imprimatur.

Accordingly, the cross motions of the proposed intervenors/respondents, the Police Benevolent Association of the New York State Troopers, Inc., the New York State Police Investigators Association, and Lavonne Williams, respectively, for permission to intervene in the proceeding are granted without opposition.

The application of petitioner, the New York State Attorney General, for leave to renew his 1977 and 1980 applications is granted. Upon renewal of those prior applications, the Attorney

---

**30.** That is so despite the absence of any "statutory authority which would require" that grand jury witnesses/targets "be given notice before" the granting of an ex parte application for disclosure of grand jury minutes (Matter of Aswad v Hynes, 80 AD2d 382, 384 [3d Dept 1981]).

General's requests to modify the prior orders of Justices Ball and Marshall, respectively, are granted in part and denied in part. The requests are denied insofar as it is determined herein, in adherence to Justice Ball's 1977 order (as affirmed on appeal), that the Attorney General may not disclose so much of volumes 2 and 3 of the Meyer Report as quotes from, paraphrases, or otherwise references grand jury evidence or any other matter attending the grand jury proceeding. The requests are granted insofar as it is determined herein, in adherence to the spirit of Justice Ball's 1977 order, the Appellate Division's 1979 order of affirmance, and the Appellate Division's 1979 order denying the motion to amend its order of affirmance, but in alteration of Justice Marshall's 1981 order, that the Attorney General may release those portions of volumes 2 and 3 of the Meyer Report as do not reference grand jury evidence, and may do so following his proposed redaction of the names of and other identifying information about those individuals who are mentioned in those non-grand jury-referencing portions of volumes 2 and 3 of the Meyer Report.

The request by the Attorney General that this court establish a procedure whereby persons who may be affected by the public release of the aforementioned non-grand jury-referencing portions of the Meyer Report may review such portions and be heard on the issues of redaction and publication is denied.